**EXHIBIT D**

Neutral Citation Number: **[2005] EWHC 2946 (Pat)**

Case No: HC05C00661

**IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
PATENTS COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 21st December 2005

Before :

**THE HONOURABLE MR JUSTICE PUMFREY**

- - - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **JEROME CANADY** | **Claimant** |
| - and - | |
| (1) **ERBE ELEKTROMEDIZIN GMBH**<br>(2) **ERBE MEDICAL UK LIMITED**<br>(3) **KEYMED (MEDICAL AND INDUSTRIAL EQUIPMENT) LIMITED**<br>(4) **OLYMPUS CORPORATION** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Justin Turner** (instructed by **Bird & Bird**) for the **Claimant**
**Andrew Waugh QC** and **Thomas Hinchliffe** (instructed by **CMS Cameron McKenna**) for the **First and Second Defendants**
**Richard Hacon** (instructed by **Bristows**) for the **Third and Fourth Defendants**

Hearing dates: 7th & 8th December 2005
- - - - - - - - - - - - - - - - - - - - -
Judgment

**Mr Justice Pumfrey :**

**Introduction**

1. This is an action for infringement of European Patent (UK) No. 0595967. The title of the invention is "Surgical Coagulation Device" and the inventor and proprietor of the patent is Dr Jerome Canady. The proceedings were started on 21st March 2005. The First and Second Defendants are respectively a substantial German manufacturer of medical equipment and its UK distributor. The Fourth Defendant is the well-known Japanese manufacturer of optical equipment, and the Third Defendant distributes the Fourth Defendant's medical products in the UK. The Particulars of Infringement complain of the sale of flexible probes intended for endoscopic application of the argon plasma coagulation technique. The probes are made by the First Defendant and distributed in the United Kingdom by the Second Defendant under the Erbe mark and by the Third Defendant under both the Olympus mark and the Erbe mark: I shall refer to the allegedly infringing probes as the Olympus probes and the Erbe probes. No issue arises in relation to the importation and sale in the United Kingdom of the probes in question, it being accepted that the First and Second Defendants are jointly liable in respect of Erbe probes sold in the United Kingdom, and the Third and Fourth Defendants are jointly liable in respect of Olympus probes sold in the United Kingdom.

2. On 25th July 2005, on an application by the Third and Fourth Defendants, I ordered a separate trial of the issue of infringement. In summary, my reasons were that the Third and Fourth Defendants were unwilling to conduct a full trial of the issue of validity, since they considered that they had a compelling point on non-infringement which did not depend for its force upon a consideration of any items of prior art: the specification itself, of course, has nonetheless to be construed through the eyes of the person skilled in the art at the priority date. I accordingly made the order for separate trial of the issue of infringement on condition that the Third and Fourth Defendants withdraw their allegations of invalidity. The validity of the patent remains in issue between the patentee and the First and Second Defendants.

**Technical Background**

3. The patent is concerned with the use of argon beam coagulator systems. At the priority date, argon plasma coagulation or APC, as the technique is now called, was a new method of coagulating tissue in the gastro-intestinal tract and elsewhere. The evidence of Dr Christopher Williams, an eminent gastro-intestinal endoscopist who gave evidence on behalf of Olympus, was that at least since 1973 it has been desirable on occasion to perform simple electro-coagulation of minor intestinal lesions such as abnormal blood vessels, bleeding points or small residual areas of polyp remaining after polypectomy. Polyps are removed using an instrument called a snare, a modern example of which is X4. Since before the priority date, gastro-intestinal endoscopists have, as I understand the evidence, been accustomed to use so-called "hot" polypectomy snares. Such snares are used with a diathermy current, that is, a current having a frequency typically between 200kHz and 0.5MHz. It appears that such implements are used in so-called "monopolar" arrangements: a first electrode having a substantial area (of the order of 200 sq cm) is attached to the patient's skin, usually on the thigh; the second electrode is provided by the polypectomy snare itself. The current density in such an arrangement will be high only adjacent to the snare itself,

the remainder of its feed-wire being insulated. The wave-form of the diathermy current can be varied so as to assist in cutting and to coagulate the tissue at the resulting wound by the application of heat.

4. A similar technique was used before the priority date in the performance of biopsies, as I understand Dr Williams' evidence. The purpose of a biopsy is to take a tissue sample, and so-called "hot" biopsy forceps consist of small forceps which slide within a tube and which open upon their emergence from it. The forceps are opened and grasp the tissue to be biopsied, e.g. a polyp. The coagulating current is applied and the tissue around the forceps is heated. Given that the current is of high frequency, the heating effect within the forceps is much less, and the tissue sample can be retrieved for examination. This technique is also used to destroy small polyps.

5. The essential adjunct of these techniques at the priority date was the endoscope. The endoscope is a sophisticated optical instrument which consists essentially of a tube in which are located, first, mechanical means for controlling the orientation of the tip, so that it can be manipulated round the bends in the bowel (for example); an optical fibre bundle for transmitting illumination from the proximal end to the distal end, so that the operator can visualise the inside of the vessel; a channel, called the instrument channel, for passing any instrument that the operator may wish to use to the distal end of the endoscope; and some means for viewing close to the distal end, to provide the operator with a television image of the region beyond the distal end of the endoscope. That is a very simple description, and there may be other channels for carrying gas and water as required. Such instruments were commonplace before the priority date.

6. The title of the patent and its opening words make it clear that the patent is addressed to a manufacturer who wishes to construct an argon beam coagulator for use in combination with typical endoscopes, such as hysteroscopes, gastroscopes, colonoscopes and laparoscopes. It was agreed, I think, that such a manufacturer would necessarily go to skilled endoscopists for advice relating to the methods they employed in carrying out endoscopic procedures.

7. The patent commences with a description of the background art, which acknowledges in very general terms the electrosurgical generators that are used with the instruments which I have described above.

8. At page 1 line 25, argon beam coagulators are described in the following terms:

> "Recently, argon beam coagulators have been demonstrated to be effective tissue coagulators. Presently available argon beam coagulators include a flexible cable having a nozzle tip with an opening through which the argon gas flows. The device includes a handle immediately adjacent the nozzle tip for placing the tip in position for tissue coagulation. Within the tip is located a tungsten needle for discharging radiofrequency (RF) current which ionizes the argon gas. The stream of ionized argon, a colorless, odorless, inactive gas, conducts the current to the tissue and blood vessels, while effectively blowing blood away from the vessels and allowing coagulation within vessel walls."

9. After referring to three publications relating to the use of argon beam coagulators, a US Patent, No. 4,060,088, is acknowledged as disclosing such an argon beam coagulator. This patent is said to disclose a coagulator having all the features of the preamble of claim 1, to which I shall return. It is said that the coagulator is not adapted to be used in combination with typical endoscopes.

10. There is no doubt, therefore, that the core of the invention is an argon beam coagulator that can be used in an endoscope.

11. It is convenient to set out the claim at this point, although it contains phraseology the sense of which can only be appreciated in the context of the description of the preferred embodiment. The claim is as follows:

> "A surgical tissue coagulator (A) comprising an elongate, biocompatible, tube (10) having an open distal end (12) and a proximal end (14);
>
> means (22) for connecting the proximal end (14) of said tube (10) with a source (24) of an inert, ionizable gas so that a stream of said gas can flow through said tube (10) and exit the distal end (12) of said tube (10);
>
> a handle 18 attached to said tube (10) adjacent the proximal end (14) of the tube (10) for maneuvering said tube;
>
> a wire (28) within said tube (10) for conducting radiofrequency current, the wire (28) having a distal end (30) for positioning adjacent the distal end (12) of said tube (10),
>
> and means (32) at the distal end (30) of said wire (28) for discharging an arc (34) of radiofrequency energy away from the distal end (30) of said wire (28) within said stream of inert gas exiting the distal end (12) of said tube (10) so as to form an ionized gas stream which is capable of coagulating tissue (38) during endoscopic surgery within a patient,
>
> the wire (28) having a proximal end (40) opposite the distal end (30) of the wire (28), and means (42) for connecting the proximal end (40) of the wire (28) with a source (44) of radiofrequency energy,
>
> characterized in that
>
> said tube (10) and said wire (28) are flexible,
>
> the tube has further an external diameter of less than about 5 mm,
>
> is insertable into a surgical endoscope (16) having a length of at least about 35cm,
>
> and in that

said handle is adapted for maneuvering said tube (10) within
said endoscope (16) while said handle (18) is outside said
endoscope (16)."

12. It is also necessary to note claim 2, which calls for a coagulator according to claim 1, wherein the wire (28) is longitudinally movable within the tube (10).

13. The passage at column 1 line 50 acknowledging USP 4060088 suggests that that publication discloses a coagulator comprising the features of the preamble (i.e. down to the words "characterized in that") of claim 1. This is probably not quite correct, if only because 088 does not disclose a device capable of being used with an endoscope, if that is what the words "endoscopic surgery within a patient" mean. The device disclosed in 088 can best be likened to a large pen, through the middle of which passes the electrode which is either generally needle-like and round which the gas flows or is generally tube-like and through which the gas flows. In either case, the device is intended to be held in the hand.

14. I can now return to the description of the preferred embodiment. The basic feature of the coagulator of claim 1 is that it is made with a flexible tube (column 2 lines 54-58). The preferred material is a silicone elastomer. The patent suggests that the external diameter of the tube is less than about 5 mm, and this is consistent with the need to be able to insert it in the channel of a surgical endoscope (column 3 lines 11-25).



15. Figure 1 (reproduced above) clearly shows a handle which is said to be "attached to tube 10 adjacent the proximal end 14 of the tube. Handle 18 is provided for maneuvering tube 10 within endoscope 16 (shown in figure 2) while handle 18 is outside the endoscope."

16. The word "maneuverable" echoes the same word at column 3 line 3, where it is said that the tube is insertable into, and manoeuvrable within, a surgical endoscope. In the described embodiment, the handle has two further functions. The first, referred to at column 4 lines 15-30, is to provide connectors for the gas supply and for the radiofrequency current. The second, described at column 4 line 54 to column 5 line 3, is to move the wire within the tube 10.

17. Finally, it may be noted that the invention certainly contemplates the attachment of other instruments to the end of the wire 28. The examples given are a polypectomy snare (claim 4), biopsy forceps (claim 5) and a dissection needle (claim 6). The snare

and the forceps as claimed work in the conventional manner, opening out as they move from inside the tube 10 to outside the tube 10.

**The Alleged Infringements**

18. Each of the alleged infringements, though differing in detail, can be described as follows. They are all probes intended to be used in combination with an endoscope for argon plasma coagulation. Each is intended to be inserted through the instrument port into the endoscope and, in normal use, to protrude a short distance, at least sufficient to enable it to be seen by the television camera, from the distal end. The proximal end of each tube is provided with a connector, which serves to connect the wire running up the middle of each tube to a source of radiofrequency (RF) energy, and also to connect the tube to a source of gas. Not all endoscopes are the same length. The question of length of the probes, and the instruments for which the probes are sold, was not gone into in detail in the evidence, it seems because it did not arise on the pleaded cases on infringement (see below). All the evidence I heard related to colonoscopes, and national preference varies. A common working length is 168 cm. Others are shorter. A small intestine endoscope is sold that has a working length of 2m. Other specialist instruments have working lengths that are greater still.

19. All the Erbe probes at issue in the action are set out in Martin Hagg's exhibit MH2. Mr Hagg is the vice-President of Design and Engineering at Erbe and explains the product range, and describes the connectors with which the probes are equipped. The list reveals that Erbe make or have in the past made probes having lengths of 3m, 2.9m, 2.5m, 2.2m, and 1.5m. There is also a 1m model, number 178, which is not yet supplied by Olympus and not supplied by Erbe. Current production includes all these lengths, either reusable or disposable. The connectors have different shapes: older designs tend to have connectors that are jack-plug shaped, and newer designs have connectors that are smaller and flatter. The claimant draws no particular distinction between them, and I illustrate them here. Each connector is said (correctly) by the claimant to be adapted to be gripped by the thumb and forefinger.



20. The distal end of the probes is marked with five circumferential bands spaced by 1cm that provide a visual indication of the extent to which the probe protrudes from the distal end of the endoscope. Obviously, this coarse graduation ceases when the distal end of the probe protrudes by more than 5cm from the endoscope.

21. Mr Hagg's unchallenged evidence is that colonoscopes have working channels of length 160cm to 200cm, and that the appropriate probe for these instruments is 220cm long. Generally, he says that each probe is designed to have the length of the working channel plus at least 20cm. Mr Hagg says that this is so that the connector plug and the connector cable are kept out of the way of the endoscopist during a procedure.

22. In use, I am satisfied that, on the evidence, a portion of tube no less than 15-20cm in length emerges from the instrument port of the endoscope. I shall return to this topic below. I was provided with recordings of demonstration procedures carried out by Dr Fairclough, Dr Williams, Dr Saunders and Dr Waye, each of whom is an acknowledged expert in the field. From these demonstrations, I formed the following impression. In use, I understand that the manipulation of the endoscope to its correct position and the positioning of any instrument will both be performed by the operator. The operator must first position the endoscope close to the point in the bowel (for example) where it is intended to employ the instrument. He or she will then pass the instrument along the instrument channel and position it precisely both by adjusting the position of the endoscope and by moving the instrument itself within the instrument channel, while watching the television picture showing the state of things at the distal end of the endoscope. Some instruments or techniques require more than two hands, and the operator is invariably accompanied by a skilled assistant. For example, while the operator will position the biopsy forceps, it is common for the assistant to operate them using the operating handle provided.

23. The endoscope handle is conventionally held in the left hand, the fingers of which are used to adjust the two wheels that set the direction of the flexible end of the endoscope with reference to the main shaft, which, although itself flexible, is not capable of steering round sharp corners. When inspection of the tissue of interest reveals the need to use APC, the APC probe is first connected to a heavier tube, which brings both the gas supply and the RF supply from the control unit. The probe is then purged of air by passing argon through it, and the correctness of the RF connection is verified by touching the end of the probe to a specific terminal on the control unit. These tasks appear to be performed by the operator's assistant. It seems that the assistant then passes one end of the probe to the operator, who inserts it a few centimetres at a time into the instrument port of the endoscope by gripping the probe between thumb and forefinger and pushing, while watching the monitor for its appearance at the distal end of the endoscope. The practice among operators seems to vary: Dr Fairclough arranged matters so that the supply tube could be passed over his shoulder, while others appear to rely on the assistant to hold the supply tube, possibly by the connector. In any case, it is plainly undesirable for any part of the probe to touch the ground, and so some technique for preventing this must be employed.

24. The arc must be struck under the control of the operator, and, so far as the filmed procedures are concerned, the operators all seem to rely upon their ability to make small adjustments to the position of the tip of the probe by gripping it between the fingers close to the instrument port of the endoscope and pushing or pulling as appropriate. The larger movements provided by the flexible tip of the endoscope also

appear to be important, but my clear impression was that final positioning and withdrawal after a plasma pulse (the operator uses a foot-pedal to control the argon flow and RF current together) are achieved in this manner. The need for precision is indicated by the fact that the arc is struck when the end of the probe is about 1-2 mm away from the tissue that is to be coagulated. Although the drying effect of this process tends to reduce the current and so eventually extinguish the arc, I understand that this self-limiting feature does not entirely remove the risk of perforating the vessel. The finger grip on the probe obviously provides the operators with the delicate control that is required.

25. In withdrawing the probe, it appears that the operator will often grip the probe close to the instrument port, and pull out 20cm or so of probe, the remainder being withdrawn by the assistant, who may take steps such as the wiping of the probe with a swab as it is removed, to reduce contamination. At least in colonoscopy, the assistant will only hold the probe by those parts which have not been held by the operator, since this also reduces contamination.

26. This method of manipulating the probe seems to be no different from that which is employed for positioning hot biopsy forceps for the treatment of a small polyp, a procedure demonstrated at the end of his film by Dr Fairclough. In this case, the operator again positions the forceps by gripping the insulating tube through which the RF wire passes, and the assistant manipulates the handle attached to the end of the wire to open and close the forceps at the appropriate moment.

27. There was, in the end, a pleasing degree of unanimity among the experts and the witnesses of fact as to how the probes sold by Erbe and Olympus were used. Dr Waye, Dr Saunders, Dr Fairclough and Dr Williams only ever used the shaft of the probe, held between thumb and finger, for the purpose of moving it in and out to position the probe appropriately. Dr Schilsky, whose evidence I heard by video link, suggested in his written evidence that:

> "if there is a full insertion of the catheter (i.e. on a very long scope – meaning having to use a lot of centimetres of instrument – usually in a colonoscopy) I use the plastic piece at the end of the probe to feed it in, because there is no part of the catheter that is available to grab. For the same reason, when the probe is fully inserted I hold it by the same piece when manipulating it within the patient during the procedure."

Under cross-examination, it appeared that Dr Schilsky had only ever done this once, when there was a "mismatch" between the probe and the endoscope which, in its context, plainly meant a mismatch in length. He also accepted that if there were sufficient catheter outside the port that the tube tended to bend, then the plastic piece could not be used for this purpose. He accepted that to use it while the catheter was being inserted would be very difficult and rare. Dr Johnson, the claimant's expert and professor of medicine at Eastern Virginia Medical School, took the view that if the probe extended over 5cm from the distal end of the endoscope, it was still possible to use the APC procedure, but, as I understood his evidence, he accepted that this was a rare exception. He agreed that you cannot use the connector for fine movements required to get the probe to the place of treatment. Nonetheless, he had done it once within his recollection, in what he described as a "kind of frantic manoeuvre", but

under cross-examination he could not remember whether, in that unique instance, he had in fact used the connector to manipulate the device or had done it with his fingers, his main recollection being of nearly having run out of instrument. He readily accepted that the movement of the probe both towards and away from the distal end of the endoscope is invariably done by the clinician.

28. I find that in normal use a probe substantially longer than the distance from port to distal end of the endoscope is used in APC. The excess of length is employed so as to enable the operator to manipulate the position of the probe with complete precision. During an APC procedure, the operator will invariably move the probe to and fro in the endoscope channel so as to position it correctly with respect to the tissue to be treated, by gripping the probe close to the instrument port with his or her fingers and pushing or pulling. While the connector may be used for withdrawal of the probe from the endoscope by the assistant, such use is certainly not invariable and it is never used for insertion of the instrument into the endoscope.

**Infringement**

29. It is accepted that both the Erbe and the Olympus probes have all the pre-characterising features of claim 1, with the exception of the handle. The claim requires the handle (18) to be attached to the tube (10) adjacent the proximal end (14) of the tube (10) for manoeuvring the tube, and further requires that the handle is adapted for manoeuvring the tube (10) within the endoscope (16) while said handle (18) is outside the endoscope (16). Erbe and Olympus say that their probes have no handle. This raises a straightforward question as to the meaning of "handle" in the claim.

30. On 25th July 2005, I directed that each party should independently provide a statement of case on infringement. It is helpful to set out the whole of the material part of the Claimant's case:

> "3. 'Handle' is an ordinary English word meaning that part of a thing which is grasped by the hand in using or moving it.
>
> 4. Each of the products in suit includes a plastic piece adjacent and attached to the proximal end of the probe tube. The part is specifically formed to be grasped by the hand by:
>
>> (a) [matter omitted] the provision of indents on the top and bottom surface of a typical shape to facilitate the grip of the thumb and first finger. [In certain cases] the part is in addition tapered such that the end facing along the length of the probe is thicker than the opposite end, to further improve the grip;
>>
>> (b) [or] the provision of raised rings, positioned a suitable distance apart to permit the body of the part to be gripped between the thumb and

> fingers, to facilitate the part being held securely without slipping.
>
> The part is accordingly a handle made to be grasped by the hand in using or manoeuvring the probe.
>
> 5. To manoeuvre an object is to control its movement and direction. The provision of indents or raised rings on the plastic handle is an adaptation to improve the surgeon's grip to enable the surgeon more accurately to control the probe's movement forward and backward within the endoscope. The handle is accordingly adapted for manoeuvring the probe within the endoscope while the handle remains outside the endoscope."

31. The statement of case for Erbe sets out the two requirements of the claim which I have quoted and says that the handle must be both suitable for manoeuvring the tube and adapted (i.e. made suitable for) manoeuvring the tube within the endoscope. They say that, properly viewed, the plastic piece on the proximal end of their probes is just a connector plug and would not be seen to be a handle by the person skilled in the art. They further say that the connector plugs are not suitable for manoeuvring the tube, since in general they cannot be used for pushing the tube into the endoscope because the tube just bends, and cannot be used to position the tube for performing an APC procedure.

32. Olympus say much the same, but emphasise that "nothing other than the probe itself is suitable for manoeuvring the probe". They also point out that the claim does not require "means for manoeuvring", but contains the specific feature of a handle for manoeuvring,

**The Approach to Construction**

33. The speech of Lord Hoffmann in *Kirin-Angen Inc v. Hoechst Marion Roussel Limited* [2004] UKHL 46, [2005] RPC 9 sets out in [33] to [35] the principle of construction of patent specifications. His very slightly qualified approval of the summary of the law propounded by Jacob LJ in *Rockwater Limited v. Technip France SA* [2004] EWCA Civ 381, [2004] RPC 46 has led to the latter slightly restating that summary in *Mayne v. Pharmacia* [2005] EWCA Civ 137, [2005] IP&T 774. The principles as restated are as follows:

> "(a)   The first, overarching principle, is that contained in Art.69 [of the European Patent Convention] itself . . .
>
> (b)   Article 69 says that the extent of protection is determined *by the terms of the claims*. It goes on to say that the description and drawings shall be used to interpret the claims. In short the claims are to be construed in context.

(c)  It follows that the claims are to be construed purposively – the inventor's purpose being ascertained from the description and drawings.

(d)  It further follows that the claims must not be construed as if they stood alone – the drawings and description only being used to resolve any ambiguity . . . Purpose is vital to the construction of claims.

(e)  . . .

(f)  Nonetheless purpose is not the be-all and end-all. One is still at the end of the day concerned with the meaning of the language used. Hence the other extreme of the Protocol – a mere guideline – is also ruled out by Art.69 itself. It is the terms of the claims which delineate the patentee's territory.

(g)  It follows that if the patentee has included what is obviously a deliberate limitation in his claims, it must have a meaning. One cannot disregard obviously intentional elements . . .

(h)  It also follows that where a patentee has used a word or phrase which, *acontextually*, might have a particular meaning (narrow or wide) it does not necessarily have that meaning in context . . .

(i)  It further follows that there is no general "doctrine of equivalents" . . .

(j)  On the other hand purposive construction can lead to the conclusion that a technically trivial or minor difference between an element of a claim and the corresponding element of the alleged infringement nonetheless falls within the meaning of the element when read purposively. This is not because there is a doctrine of equivalents: it is because that is the fair way to read the claim in context.

(k)  Finally purposive construction leads one to eschew what Lord Diplock in *Catnic* [*Catnic Components Limited v. Hill & Smith Limited* [1982] RPC 183] called (at p.243):

> "The kind of meticulous verbal analysis in which lawyers are too often tempted by their training to indulge"."

**The skilled person**

34. The specification is to be construed through the eyes of the skilled addressee. The specification is clearly addressed to the manufacturer of probes, who will, I infer, consult with users about the qualities of the probe. I heard expert evidence only from users: Dr Johnson for Canady, Dr Fairclough for Erbe and Dr Williams for Olympus. Each was an experienced endoscopist. All were agreed that 'handle' has no special meaning in the context of endoscopy instruments in general or APC probes in particular, as one would expect.

35. I start my examination of the problem raised by the word "handle" by considering what the specification tells us about the handle and its use. The answer is: not a lot. The passage at page 3 lines 26-30 merely echoes the characterising feature of the claim. The handle includes the connector for gas and RF. More notably, in the preferred embodiment, it is clearly there to operate the wire in the same way as wires were operated in hot biopsy forceps and hot snares. Dr Williams (Olympus's expert) recognised the handle shown and described in the specification as being the sort of handle the skilled person was familiar with from other implements, at least so far as shown in the drawings. There is nothing in the body of the specification that refers to an embodiment of the invention in which the wire is fixed with respect to the tube, and so the purpose of the handle in such a case becomes rather different: it is to move the tube rather than the wire. What the specification certainly does not suggest is that the handle is optional, becoming useful only when the wire is movable.

36. It seems to me that the specification itself throws little light on the manner in which the handle is to be employed when the wire is fixed. Indeed, the tube 10 in all the embodiments is made from elastomeric material, and is no doubt to a greater or lesser extent liable to bend under compression. I conclude nonetheless that the handle is the same sort of handle that the skilled man would have been familiar with in 1992, because it was used for other sorts of instruments within an endoscope, albeit that it has now to be provided with passages for gas as well as for RF.

37. The problem, in my judgment, is caused not so much by the requirement for the handle, but by the operation for which it must be suitable. Now, a handle may be suitable for carrying out a particular manipulation, even if it is never used for that purpose, there being a better handle somewhere else. That observation, however, does not assist me in the present case, because if the handle is the connector, the handle is not suitable for pushing. It is only suitable for pushing if you have already pushed too far: that is, far enough to bring the handle into close proximity (less than 5-10 cm) with the instrument port, and even then the push must be sufficiently axial of the tube for the latter not to bend or kink when force is applied.

38. It must also be remembered that the handle of the claim is distinct from the "means for connecting the proximal end of the wire with the source of radiofrequency energy and the means for connecting the proximal end of the tube with a source of inert ionisable gas", i.e. the connector, although both functions can be combined in one object. It goes without saying that the connector must be present somewhere, whether the connection is to a supply tube of the kind which is used in the present case or to the control unit itself (which is never done). The handle must, it seems to me, perform some function over and above merely connecting. Where there is no identifiable component which does perform such a further function in fact, and the

connector is not designed or used or considered suitable for performing such a function in fact, it seems to me that it is difficult to consider the connector to be a handle in the sense in which that word is being employed in the specification.

39. The word 'manoeuvring' must also be considered. In my view, it clearly has the sense of 'positioning' the tube so as to enable the APC procedure to be carried out. The word is used to identify a capability of the handle.

40. The consideration which has weighed most heavily with me in favour of the patentee's case (although, it has to be said, not in favour of the construction of the claim which the patentee seeks to place upon it) is the thought that if there is no part of these probes which is to be considered a handle within the meaning of the claim, then the claim can be easily circumvented. This might be thought to be unfair to the patentee. In this context, Jacob LJ's proposition (g), which finds its origin in *STEP v. Emson* [1993] RPC 513 at 522, provides, at least in part, an answer. Reading the specification as a whole, it is to be noted that the preferred embodiment employs a movable wire which is moved by the handle. The purpose of the movable wire is to operate additional instruments, such as the biopsy forceps of figure 4 or the polypectomy snare of figure 3, and, of course, the simple probe does not have these advantages, if advantages they be. The reference to a handle is for this reason at least comprehensible, even if it remains the fact that the handle of such a device is not used for manoeuvring the device into position, but only for operating the snare or forceps or other instrument, as the case may be.

41. I conclude that there is here no infringement. I have deliberately concentrated on the handle, giving its associated qualifications "for manoeuvring" and "adapted for manoeuvring" as wide a meaning as I think they can reasonably bear. I have also ignored the manifest difficulties caused by the concluding words of the claim, "while said handle is outside said endoscope", which I believe merely emphasise where the handle should be while the manoeuvring is taking place. Since these words cannot imply that the handle is capable of entering the endoscope, they must, in my judgment, strengthen the suggestion that the handle should be suitable for manoeuvring the tube wherever it may be outside the endoscope.

42. The approach which I have adopted above was heavily criticised by Mr Turner on behalf of the patentee, who submitted that the claim is a claim to a device consisting of a handle to which a flexible tube and, within it, a flexible wire are attached. He submitted that it should be possible to judge infringement without reference to the endoscope for use in which the probe is supplied. Thus, if it is possible to find a combination of probe and endoscope in which the relationship between the length of the instrument channel and the probe is such that when the probe is protruding by an acceptable distance from the distal end of the endoscope the connector must be used for the purpose of moving it to and fro, that would be sufficient for infringement. After all, Mr Turner submits, the word "handle" is an ordinary word having no special meaning in this art, and the construction I have placed upon it above turns it into a word of special meaning. It does not matter if the single procedures carried out by Dr Schilsky and Dr Johnson were unique and incorrect, because they showed that the connector could be used for manoeuvring the probe, and that was enough.

43. In my view, this submission is incorrect for two reasons. The first lies in the idea of "mismatch" between endoscope and probe which was a meaningful concept to Dr

Schilsky. Where the probes are explicitly manufactured in standard lengths and sold as suitable for use with a range of endoscopes, and where the claim itself requires the whole device to be "capable of coagulating tissue during endoscopic surgery within a patient", it is wrong to consider the probe in isolation. Without the endoscope in which it is intended to be used, the qualities of the probe cannot be assessed, and those qualities include, in my judgment, whether it has a relevant handle. Mr Waugh QC summarised this point by saying that the handle cannot be suitable for manoeuvring the tube if, when it is being used for that purpose, the probe as a whole is being misused. Mr Hacon provided the second answer: to construe a word of indeterminate but general scope in context is not to treat it as a word having a special meaning in the art. It is merely working out the width of its meaning in its context in the document.

44. As a final submission, not foreshadowed in his statement of case, Mr Turner suggested that there would be infringement if the connector were suitable for gripping by the assistant for the purpose only of withdrawing the probe from the endoscope. Mr Hacon called this the Manoeuvring-just-by-pulling case. But this is not the kind of manoeuvring the specification is interested in. The probe is manoeuvred to bring it to the right position for the APC procedure to be carried out. Nothing is said about insertion and removal.

45. Accordingly, this action must be dismissed. Olympus are entitled to the declarations of non-infringement in relation to the probes set out in their product description, including those for use in bronchoscopes, which they have not yet introduced in this jurisdiction.